Filed 10/19/22  P. v. Moore CA4/2
Opinion following recall of remittitur

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062293 |
| v. | (Super.Ct.No. RIF1206606) |
| JAMAR ORONDE MOORE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas E. Kelly, Judge.  (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed in part; affirmed in part with directions.

Allen G. Weinberg and Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Kamala D. Harris, Attorneys General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland and Charles C.

1

Ragland, Assistant Attorney General, Melissa A. Mandel, Arlene A. Sevidal and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

Michael A. Hestrin, District Attorney, Emily R. Hanks and Jesse Male, Deputy District Attorneys as Amicus Curiae for the People of the State of California.

In 2014, a jury found defendant and appellant Jamar Oronde Moore guilty of three counts of willfully committing a lewd or lascivious act with a child who is under the age of 14 years old.  (Pen. Code, § 288, subd. (a).)[1]  The jury found true the allegation that defendant committed the offenses against more than one victim.  (§ 667.61, subd. (e)(4).)  The trial court sentenced defendant to prison for a term of 30 years to life.

In 2015, defendant raised seven issues on appeal.  First, defendant contended the trial court erred by admitting evidence of uncharged sexual misconduct.  (Evid. Code, § 1108.)  Second, defendant asserted if his trial counsel forfeited the Evidence Code section 1108 issue, then he received ineffective assistance of counsel.  Third, defendant contended the trial court erred by allowing Jane Doe 2 (Niece) to testify prior to her mother and aunt, who were Nieces's support people.  (§ 868.5.)

Fourth, defendant asserted the trial court erred by instructing the jury with CALCRIM No. 1191.  Fifth, defendant contended the trial court erred by instructing the jury with CALCRIM No. 375.  Sixth, defendant asserted the cumulative effect of erroneously instructing the jury with CALCRIM Nos. 375 and 1191 deprived him of a

---

[1]  All subsequent statutory references will be to the Penal Code unless otherwise indicated.

2

fair trial.  Seventh, defendant contended the trial court erred by imposing a no-contact order that lacked an expiration date.  The People conceded defendant's seventh contention was correct.  In an opinion filed in 2015, we directed the trial court to amend the protective order to include the duration of the order, but otherwise affirmed the judgment.

In January 2022, defendant moved to recall the remittitur due to ineffective assistance of appellate counsel.  The Attorney General did not oppose the motion.  This court recalled the remittitur, canceled the remittitur, vacated our 2015 opinion, and reinstated defendant's appeal.[2]  Defendant filed a supplemental brief raising two additional issues.  In the eighth issue, defendant asserts the trial court erred by not recording the jury's initial "not true" finding on the multiple victim allegation (§ 667.61, subd. (e)(4)).  In the ninth issue, defendant contends the booking fee is no longer authorized and should be vacated.  We reverse in part and affirm in part with directions.

---

[2]  "On a party's or its own motion or on stipulation, and for good cause, the court may stay a remittitur's issuance for a reasonable period or order its recall."  (Cal. Rules of Court, rule 8.272(c)(2).)  This court notified the Attorney General that we would grant defendant's motion to recall the remittitur if the Attorney General did not oppose the motion by a certain date.  The Attorney General did not file an opposition, which this court treated as an implied stipulation to grant the motion.

# FACTUAL AND PROCEDURAL HISTORY[3]

A.     PROSECUTION'S CASE

　　　1.     *NIECE*

Niece was born in 1998 and is one of defendant's nieces. At the time of trial, in June 2014, Niece was 15 years old. When Niece was approximately five years old, she went to defendant's house to play with defendant's daughter, Jane Doe 4 (Daughter). Niece and Daughter played with dolls while at defendant's house. While the girls played, defendant placed a blanket over Niece, which covered her from her waist to her feet. Defendant then touched Niece's feet. The feet touching occurred on approximately five separate occasions. Defendant told Niece that he was massaging her feet.

One day, the rubbing on Niece's feet did not feel like defendant's hand because it felt "wet and cold." Niece lifted up the blanket. Niece saw defendant was rubbing his penis on her foot. Niece told Daughter to look at what defendant was doing. Daughter looked underneath the blanket and said, " 'Ew.' " Defendant became upset and told Daughter not to look under the blanket. Niece moved her feet away from defendant.

In first grade, Niece attended a school assembly about sexual abuse. After the assembly, Niece told her mother about defendant touching her feet. When Niece was 13 or 14 years old, she told her cousin, Jane Doe 1, about defendant touching her feet.

---

[3] The "Factual and Procedural History" section has not been substantively changed from the 2015 opinion.

## 2.    *NIECE-2*

Jane Doe 1 (Niece-2) was born in 2000 and is defendant's niece.  At the time of trial, in 2014, Niece-2 was 13 years old.  When Niece-2 was approximately seven years old, she spent the night at defendant's house.  While at defendant's house, Niece-2 shared a bed with Daughter and Daughter's brother.  Niece-2 had not yet fallen asleep when she saw defendant in white boxer shorts.  Niece-2 felt something round, about the size of a 50-cent piece, that wasn't exactly hard or soft rubbing her feet.  The rubbing was an up-and-down motion and lasted for approximately 20 seconds.  Niece-2's feet then felt wet with a thin liquid that was more "like water" than lotion.

The daughter and her brother were asleep.  Niece-2 asked Daughter, " 'Did you see that?' "  Daughter said, " 'No,' " and fell back asleep.  Defendant left the room.  Niece-2 lay in the bed feeling confused and scared.

## 3.    *DAUGHTER*

Defendant was not charged with misconduct related to Daughter.  (Evid. Code, § 1108.)  Daughter was born in 2001.  Daughter was 13 years old at the time of trial.  When Daughter was 11 years old, she was sleeping at defendant's house in the same bed as her three cousins, Niece-2, Jane Doe 3 (Cousin), and Niece-2.  Daughter awoke when defendant opened the bedroom door.  Defendant touched Daughter's foot with his penis.  Approximately one year after the touching, defendant told Daughter he had washed her and her cousins' feet.

### 4. *COUSIN*

Cousin was born in 2003 and is the child of defendant's wife's cousin, Andrea. In Count 4, the prosecutor charged defendant with willfully committing a lewd or lascivious act upon Cousin. (§ 288, subd. (a).) The jury found defendant not guilty on Count 4. Defendant, on the night of August 11, 2012, during a meteor shower gathering, had allegedly caused Cousin's feet to touch his penis over his swim trunks while in a hot tub. The following day, Cousin told Andrea, about the incident in the hot tub.[4]

### 5. *INTERVIEW*

On August 14, 2012, defendant spoke with Riverside County Sheriff's Investigator Cole. Defendant admitted that during the meteor shower gathering he touched Andrea's foot, which made her uncomfortable. Andrea is in her 30s. Defendant explained that, while Andrea was asleep in a bedroom on the night of the meteor shower, he "fondled her foot." Andrea jumped and was startled by the touching. Defendant said, "But growing up, I, I know and I realize that as a little, little boy I've always been—had some foot fetish with them, or fascination with—for women's foot [*sic*]."

In regard to Niece-2, defendant admitted being in the bedroom, removing Niece-2's socks, and putting lotion on her feet. As to Niece, defendant said he also put lotion

---

[4] We have excluded the victims' and alleged victims' mothers' surnames in an effort to protect the victims' and alleged victims' identities. No disrespect is intended.

on her feet. Defendant explained, "I just have this thing with cleaning peoples' feet and rubbing lotion on them."

B.    DEFENDANT'S CASE

Andrea testified as a defense witness. Andrea recalled waking, during the night of the meteor shower gathering, to defendant touching her feet. Andrea was with Cousin while she was in the hot tub with defendant.

Niece's mother, Isabel, testified as a defense witness. When Niece was in the first grade, she told Isabel about defendant touching her feet with his penis. Isabel asked Niece if defendant had his pants on during the touching, at which point Niece became hysterical and cried. Niece refused to talk further about the touching. Isabel did not contact law enforcement because she was unclear as to whether defendant was wearing clothes when he touched Niece.

Niece-2's mother, April, testified as a defense witness. When April heard about defendant touching Andrea's feet, she asked her daughters if defendant had touching them inappropriately. Niece-2 denied that defendant had touched her in an inappropriate manner. April then asked if defendant ever touched Niece-2's feet, at which point Niece-2 became upset. Niece-2 told April defendant rubbed her feet, but Niece-2 did not know with what body part or object defendant rubbed her feet.

Defendant testified at trial. Defendant denied intentionally rubbing his penis on the feet of Niece, Niece-2, and Daughter. However, defendant admitted touching the feet of Niece, Niece-2, Daughter, and Andrea. Defendant explained that Niece's feet accidentally touched his penis at one point.

7

# DISCUSSION[5]

## A.      EVIDENCE CODE SECTION 1108

### 1.      *PROCEDURAL HISTORY*

Defendant was not charged with molesting Daughter.  In the prosecutor's motions in limine, the prosecutor explained that, after defendant's preliminary hearing, Daughter informed an investigator that defendant rubbed his penis on her foot.  The prosecutor sought to admit evidence of the uncharged conduct involving Daughter because it demonstrated defendant's propensity to commit sexual crimes.  (Evid. Code, § 1108.)

The prosecutor asserted the charged and uncharged acts were similar, and therefore the uncharged acts were not more inflammatory than the charged conduct. The prosecutor asserted a jury instruction could cure any issues caused by defendant not having been charged or convicted of the acts involving Daughter.  Additionally, the prosecutor argued two witnesses, one of whom was already scheduled to testify, would provide the evidence of the uncharged acts and thus the evidence would not consume an undue amount of time.  Defendant's trial counsel did not object to the prosecutor's Evidence Code section 1108 motion.

---

[5] In 2022, defendant has not raised an argument concerning the seven issues that were analyzed in the 2015 opinion.  Therefore, our analysis of the first seven issues is substantively unchanged from the discussion set forth in the 2015 opinion.

2. *ANALYSIS*

a. Contentions

Defendant raises two issues related to the uncharged sexual offense evidence. (Evid. Code, § 1108.) First, defendant asserts admitting propensity evidence under Evidence Code section 1108 violates due process. Second, defendant contends the evidence involving acts against Daughter should have been excluded under Evidence Code section 352.

b. Constitutionality

Our Supreme Court has concluded the use of propensity evidence under Evidence Code section 1108 does not violate due process. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) Defendant cites to *Falsetta* in his appellant's opening brief and concedes this court is bound by Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).) However, defendant seeks to preserve his constitutional argument for possible federal court review. Defendant is correct that we must follow our Supreme Court's precedent. Accordingly, we conclude the use of propensity evidence, in the abstract, does not violate due process. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

c. Evidentiary Ruling

We now turn to defendant's contention that the trial court erred by admitting the propensity evidence involving Daughter. The People assert defendant forfeited this issue for appeal by failing to object in the trial court. We agree defendant forfeited the

9

issue but choose to address it on the merits because it is easily resolved.  (*People v. Earp* (1999) 20 Cal.4th 826, 884 [failure to object forfeits the issue for appeal].)

"This court reviews the admissibility of evidence of prior sex offenses under an abuse of discretion standard.  [Citation.]  A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.' " (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

"Evidence Code section 352 gives a [trial] court the discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.)  Factors that a trial court should consider when deciding whether to allow the presentation of prior sexual offense evidence are:  "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did, in fact, commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*Id.* at p. 1117.)

First, in regard to probative value, we examine whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did, in fact, commit the charged offense. When Niece-2 was approximately seven years old, while Niece-2 lay awake in a bed with her cousins, including Daughter, defendant rubbed his penis on her feet. When Daughter was approximately 11 years old, she was sharing a bed with her cousins when she awoke and felt defendant touching his penis to her foot.

The crimes involving Niece-2 and Daughter are nearly identical because they both involve child relatives sharing a bed and defendant entering the room and touching the girls' feet with his penis. Due to the nearly identical nature of the acts, we conclude the act involving Daughter has probative value because it helped to support Niece-2's testimony.

Second, we address whether the propensity evidence is stronger and more inflammatory than evidence of defendant's charged acts. The evidence involving Daughter was not stronger because it was similar in nature to the evidence involving the charged acts—a victim testifying about an event that occurred years prior. Arguably the evidence involving Daughter could be considered more inflammatory because Daughter is defendant's daughter, which presents a closer relationship than with the victims of the charged acts (niece/uncle). However, the possible inflammatory nature of that relationship is balanced by Daughter being older than the victims of the charged offenses. Daughter was 11 years old when defendant allegedly touched her, whereas Niece was five years old and Niece-2 was seven years old. Thus, the uncharged act is equally inflammatory when compared to the charged acts because, while Daughter has a

11

closer relationship with defendant, the victims of the charged acts were younger and arguably more vulnerable in that sense.  Additionally, Daughter was present during the molestation of Niece and Niece-2, so the evidence involving Daughter was not more inflammatory because, to the extent one would be more incensed by defendant behaving inappropriately around his own daughter, such evidence was already part of the charged conduct.

Third, we look at whether the uncharged conduct is remote or stale.  The uncharged act was more recent than the charged acts.  Niece was 15 years old at the time of trial.  Defendant touched her when she was approximately five years old, which would mean the offenses involving Niece happened 10 years prior to trial.  Niece-2 was 13 years old at the time of trial.  Defendant touched Niece-2 when she was approximately seven years old, which would mean the molestation of Niece-2 occurred six years prior to trial.  Daughter was also 13 years old at the time of trial.  Daughter was allegedly molested two years prior to trial, when she was 11 years old.  Thus, the uncharged conduct was not remote or stale because it was the most recent conduct.

Fourth, we examine whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish defendant for his uncharged, unpunished conduct.  As explained *ante*, the conduct involving Daughter was very similar to the conduct involving Niece-2; however, because different victims were involved and both testified at trial, it is unlikely the jury would have been confused by the evidence of Daughter being touched due to the jury being able to see separate victims were involved.  Also, it is unlikely the

12

jury would have wanted to punish defendant for the uncharged, unpunished conduct because the jury found defendant not guilty of molesting Cousin, which supports the conclusion that the uncharged conduct evidence did not cause the jury to want to punish defendant to a greater degree.

Fifth, we address whether admission of the propensity evidence required an undue consumption of time. Daughter's testimony was the primary evidence of the uncharged act. Daughter's testimony consumes approximately 30 pages of the reporter's transcript, which, in total, exceeds 500 pages. Daughter's testimony was arguably brief given that it was only 30 pages in length, and thus did not consume an undue amount of time.

In sum, the uncharged conduct evidence was probative because it was nearly identical to the incident involving Niece-2 and therefore helped to support Niece-2's testimony; the uncharged conduct evidence was not more inflammatory than the evidence of the charged acts; the uncharged conduct was not chronologically remote or stale; the evidence was unlikely to confuse or distract the jury; and the evidence did not consume an undue portion of the trial. Accordingly, we conclude the trial court did not err by admitting the evidence of the uncharged conduct (Evid. Code, § 1108).

B.  INEFFECTIVE ASSISTANCE

Defendant contends that if his trial counsel forfeited the Evidence Code section 1108 issue for appeal, then he received ineffective assistance of counsel. We elected *ante* to address the merits of the uncharged conduct issue (Evid. Code, § 1108), and we

concluded the trial court did not err.  Accordingly, we do not address this alternate argument.

C.     SECTION 868.5

1.     *STATUTE*

In 2014, section 868.5, subdivision (a), provided that a victim in a molestation case may have "up to two persons of his or her choosing, one of whom may be a witness," present for support during the victim's testimony.  In regard to procedure, section 868.5, subdivision (c), provided, "The testimony of the person or persons so chosen who are also witnesses shall be presented before the testimony of the prosecuting witness."  In other words, if one of the support people is a witness, then that support person must testify before the victim.

2.     *PROCEDURAL HISTORY*

The prosecutor moved in limine to permit Niece to have two support people present during her testimony—her mother (Isabel) and her aunt (April).  The trial court asked if there were objections, and the prosecutor responded that Isabel and April were possibly going to be called as witnesses, and would hear Niece's testimony.  The trial court asked if the adults could testify before Niece.  The prosecutor said the adults could not testify before Niece because he had not yet decided whether to call them as witnesses.

Defense counsel said he had subpoenaed both Isabel and April, and they would testify as defense witnesses.  Defense counsel asserted Niece's support people should not be witnesses; she should have a victim advocate instead.  The trial court explained

14

that having potential witnesses present during Niece's testimony "opens up an avenue of cross-examination for [the] defense."

When Niece began testifying, Isabel and April were present in the courtroom. Niece said that, after a school assembly on sexual abuse, she told her Isabel about defendant touching her feet with his penis. Niece could not recall exactly what she told Isabel but remembered "crying a lot." During the cross-examination of Niece, the court took its noon recess.

Outside the presence of the jury, defense counsel said he used the recess to research section 868.5, which concerns support people. Defense counsel asserted the prosecution failed to give the required written notice about Niece's support people. Additionally, defense counsel argued that defendant's right to a fair trial was violated by having witnesses as support people because they were able to listen to Niece's testimony. Defense counsel contended April's and Isabel's testimonies were tainted. Due to the lack of notice and the two witnesses being present during Niece's testimony, defense counsel requested a mistrial.

In regard to notice, the prosecutor asserted he included the notice regarding support people in his written motions in limine, although names were not included in the written motion. As to the support people being witnesses, the prosecutor asserted he did not know until that day that Niece wanted Isabel and April to be her support people. The prosecutor asserted Isabel and April were not percipient witnesses so any tainting of the witnesses was minimal. The prosecutor argued that if Isabel's and April's testimonies differed from what they told the police, then defense counsel could impeach

15

them, and defense counsel could cross-examine them about being present during Niece's testimony.

Defense counsel asserted formal notice was required—a motion in limine was insufficient. Defense counsel also argued the "real problem" was that Isabel and April heard Niece's testimony and could "tailor their testimony" to Niece's version of the events.

The trial court concluded it had erred by allowing the prosecutor to present Niece's testimony prior to the testimonies of Isabel and April. However, the trial court was not convinced that the error was sufficiently prejudicial that a mistrial was warranted. The court took the matter under submission. The court explained that it needed to know if the witnesses would be called, and if they were called to what they would testify, before it could rule on the mistrial issue. The court said, "Fortunately, both those witnesses have given statements already. If they're consistent with the earlier statement, it would be most likely harmless error. If they have a whole different story here, then we have some problems."

The prosecutor explained that his mistake was unintentional, and he originally had not planned on calling Isabel and April as witnesses. The prosecutor further asserted Isabel and April were defense witnesses, which was complicated because if the witnesses had to testify prior to Niece (a prosecution witness) then the procedure could interfere with defendant's right not to present any evidence.

When Niece's testimony resumed, Isabel and April were not present in the courtroom. The prosecutor did not call either Isabel or April as a witness; however,

defense counsel called both women as witnesses. When Isabel testified, she said she was present during part of Niece's testimony. Isabel testified that, when Niece told her about defendant molesting her, Niece was crying. Defense counsel asked if Niece was hysterical. Isabel responded, "Yes, she was." Defense counsel asked if Isabel told Investigator Cole about Niece being hysterical. Isabel did not recall speaking to Investigator Cole. When pressed to give a yes or no answer, Isabel said she did not tell Investigator Cole that Niece was hysterical.

After the close of evidence, the trial court again addressed defendant's motion for a mistrial. Defense counsel asserted that, at a minimum, the court should declare a mistrial as to the two counts concerning Niece because Isabel's testimony was tainted as shown by Isabel adding details about Niece crying, which matched Niece's testimony, but were not in Isabel's original statement to Investigator Cole.

The prosecutor asserted Isabel's presence during part of Niece's testimony was relevant to the weight and credibility to be given Isabel's testimony, but it was not relevant to prejudice. The prosecutor asserted the error was harmless because defense counsel was able to cross-examine Isabel and April about their presence in the courtroom.

The trial court said, "I carefully went through the notes that I took of both Isabel and April's testimony, and I don't see that there was any tailoring of testimony to conform with ([Niece]). [¶] Isabel admitted the earlier statements that she made to Investigator Cole, statements that were inconsistent with ([Niece]'s) testimony, namely, crying—Isabel did admit that there was initial crying by the child. She didn't backtrack

17

or try to qualify the statements she made to the investigator. [¶] Also, April really didn't testify about the ([Niece]) incident at all when her turn came. I don't see how her testimony in any way would have been influenced by having heard ([Niece]). [¶] So there was technical error. It's unfortunate that it occurred, but I don't see any prejudice here. It's harmless error."

The trial court proposed giving the jury an instruction regarding the presence of Isabel and April during Niece's testimony. The trial court instructed the jury as follows: "Normally witnesses are excluded from the courtroom when other witnesses testify so that their own testimony is not influenced by what they hear. Isabel . . . was allowed to remain present as a support person during her daughter ([Niece]'s) testimony. You may consider . . . that fact as another factor in evaluating the credibility and weight to be given to ([Niece]) and Isabel['s] . . . testimony."

### 3. ANALYSIS

Defendant contends the trial court erred by failing to follow the procedure set forth in section 868.5. The trial court stated that it erred. We will assume the trial court was correct in finding error and discuss whether the error was harmless.

Defendant contends the harmless beyond a reasonable doubt standard should apply because the court's error impacted defendant's constitutional right to confront witnesses. (*Chapman v. California* (1967) 386 U.S. 18, 24.) For the sake of judicial efficiency, we will apply the standard defendant has selected. Under the *Chapman* standard we consider whether, beyond a reasonable doubt, the error did not contribute to the verdict. (*Ibid.*)

18

When Niece testified, she could not recall exactly what she told Isabel about the molestation, but remembered "crying a lot." Isabel testified that she asked Niece if defendant had his pants on when defendant touched Niece, at which point Niece became hysterical and cried. Niece refused to talk further about the touching. Isabel did not contact law enforcement because she was unclear as to whether defendant was wearing clothes when he touched Niece. Isabel did not recall speaking to Investigator Cole, but when pressed to give a yes or no answer, said she did not tell Investigator Cole about Niece crying.

The only point at issue is whether Niece was crying when she spoke with Isabel. In light of defendant admitting he accidentally touched Niece's foot with his penis, it is clear to us, beyond a reasonable doubt, that the error of having Isabel testify after being present for part of Niece's testimony did not contribute to the verdict.

D.   CALCRIM NO. 1191

Defendant contends the trial court erred by instructing the jury with CALCRIM No. 1191, which concerns evidence of uncharged sexual offenses (Evid. Code, § 1108). Defendant asserts the instruction violated defendant's right of due process because it permitted the jury to infer defendant was guilty of the charged offenses based upon a finding defendant committed the uncharged act, which only needed to be proved by a preponderance of the evidence. (CALCRIM No. 1191.) Defendant asserts the instruction confused and misled the jury on the burden of proof. Defendant concedes our Supreme Court has rejected a similar argument but seeks to preserve the issue for possible federal review.

CALJIC No. 2.50.01 was the predecessor of CALCRIM No. 1191. "[T]here is no material difference" between CALJIC No. 2.50.01 and CALCRIM No. 1191. (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480; see also *People v. Villatoro* (2012) 54 Cal.4th 1152, 1160 [citing *Cromp* for the "no material difference" conclusion].)

In discussing CALJIC No. 2.50.01, our Supreme Court rejected the argument defendant presents in the instant case. Our Supreme Court wrote, "We do not find it reasonably likely a jury could interpret the instruction to authorize a conviction of the charged offenses based on a lowered standard of proof. Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1016.)

Because there is no material difference between CALCRIM No. 1191 and its predecessor CALJIC No. 2.50.01, we are bound by our Supreme Court's precedent. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455 [Supreme Court decisions are binding on lower courts]; see also *People v. Cromp*, *supra*, 153 Cal.App.4th at p. 480 [relying on *Reliford* when discussing CALCRIM No. 1191].) Accordingly, we must conclude the use of CALCRIM No. 1191 did not violate defendant's right of due process.

E.    CALCRIM NO. 375

Defendant contends the trial court erred by instructing the jury with CALCRIM No. 375, which concerns using evidence of uncharged acts to prove identity, intent common, motive, and/or lack of mistake or accident (Evid. Code, § 1101, subd. (b)).

Defendant asserts the instruction permitted the jury to convict defendant under a standard of proof that is lower than beyond a reasonable doubt.

In *Reliford*, when discussing the uncharged sexual offense instruction, the high court compared it to the Evidence Code section 1101, subdivision (b), instruction. In particular, the court wrote, "We likewise reject the Court of Appeal's assertion that the instruction, even if correct, is too 'complicated' for jurors to apply. This is not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial. (E.g., CALJIC Nos. 2.50 [evidence of other crimes under Evid. Code, § 1101] . . . .)[6] As we do in each of those circumstances, we will presume here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*Reliford*, *supra*, 29 Cal.4th at p. 1016.)

Defendant concedes this court is bound by Supreme Court authority that has rejected arguments similar to those he has raised here (*Reliford*, *supra*, 29 Cal.4th at pp. 1013-1016; *People v. Virgil* (2011) 51 Cal.4th 1210, 127-1260), but seeks to preserve the issue for possible review by other courts. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455

---

**6** CALJIC 2.50 and CALCRIM No. 375 both concern evidence of uncharged misconduct used to prove identity, intent, motive, knowledge, etc. (Evid. Code, § 1101, subd. (b).)

[Supreme Court decisions are binding on lower courts]. Because we are bound by Supreme Court precedent, we conclude the trial court did not err.[7]

F.      COMBINATION OF CALCRIM NOS. 375 AND 1191

Defendant contends the combined effect of CALCRIM Nos. 375 and 1191 lowered the prosecution's burden of proof. We are bound by our Supreme Court's conclusions that the jury instructions are not confusing and do not lead to the application of a lower standard of proof. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455 [Supreme Court decisions are binding on lower courts].) Accordingly, we conclude the combination of the instructions does not require reversal.

G.      PROTECTIVE ORDER

As part of defendant's original briefing in 2015, defendant contended the trial court erred by imposing a no-contact order without an expiration date. The People conceded defendant was correct.

The trial court had authority to impose a protective order that lasted 10 years. (§ 136.2, subd. (i)(1).) At the sentencing hearing, the trial court said, "And, obviously, you're to have no contact with either of the victims in our case, either in custody or out of custody." Neither the reporter's transcript nor the clerk's transcript reflects an expiration date for the no-contact order. Accordingly, in the now-vacated 2015 opinion,

---

[7] In defendant's appellant's opening brief, he asserts it is unclear why the court instructed the jury with CALCRIM No. 375 because "[t]he People sought admission of the uncharged offense . . . only pursuant to Evidence Code section 1108." Contrary to defendant's position, the prosecutor sought to have the uncharged offense evidence admitted pursuant to Evidence Code sections 1108 and 1101, subdivision (b).

22

we concluded the trial court erred and directed the trial court to amend the protective order to include the duration of the order. (§ 136.2, subd. (i)(1).) We assume the trial court fixed that error upon the remittitur being issued years ago, and that we need not repeat the same directions to the trial court in this opinion.

H.    MULTIPLE VICTIM FINDING

1.    *PROCEDURAL HISTORY*

Count 1 pertained to Niece-2. Counts 2 and 3 concerned Niece. The jury found defendant guilty on Counts 1, 2, and 3. Count 4 pertained to Cousin. The jury found defendant not guilty on Count 4.

The verdict form initially completed by the jury for the multiple victim finding read, "We, the jury in the above-entitled action, find that the defendant, Jamar Oronde Moore, during the commission of counts 1 through 4 of the amended information, did not commit an offense against more than one victim, within the meaning of Penal Code section 667.61, subdivision (e), subsection (4)."

At 3:00 P.M., the clerk read aloud the verdicts reflecting that the jury found defendant guilty on Counts 1, 2, and 3, and not guilty on Count 4. Before the clerk read the verdict for the multiple victim finding, the following exchange occurred:

"The Court: Why don't you stop right there. [¶] So am I correct, then, that you found guilt on two or more victims?

"[Jury Foreperson]: Just guilt on [Niece] and [Niece-2].

"The Court: Yeah. That's two.

"[Jury Foreperson]: Yeah, two.

23

"The Court: All right. Special allegation, does it not read two or more? [¶] Let's see the special allegation. [¶] So your finding was two victims; correct?

"[Jury Foreperson]: Yes.

"The Court: Then I think your finding form is in error that's been submitted.

"[Jury Foreperson]: For the 1 through 4 charges—that paper?

"The Court: Let me have the bailiff submit this back to you. You tell me if this is in fact your verdict.

"[Jury Foreperson]: Oh. It says 1 through 4, not 1 to—

"The Court: Well, the reading of the finding is—

"[Jury Foreperson]: He did.

"The Court: It's two or more, I believe.

"[Jury Foreperson]: All right. So would I refill this out?

"The Court: So is there an error in the finding?

"[Jury Foreperson]: Yes. There is an error. Sorry about that.

"The Court: Let me have you go back and all 12 of you review the findings, and you tell me what the proper finding is and then come back. Okay?

"[Jury Foreperson]: All right."

After the jury resumed its deliberations, the following discussion occurred between the court and counsel:

"The Court: All right. The jury is out. Obviously, you can surmise that the finding is they did not find the allegation, yet they have convictions on two victims. So there was some confusion.

24

"[Prosecutor]: It sounded to me, Judge, like the foreperson believed that in order to find that, that they had to convict on all charges first.

"The Court: Right. When I get the forms back, I'll read that. You might want to redraft it next time around.

"[Prosecutor]: I will send a note to the people who are in charge of that, Judge.

"The Court: Well, actually that's you.

"[Prosecutor]: Well, we have a standard form that I use. I've never heard of that happening before."

At 3:05 P.M., the jury returned to the courtroom, and the clerk read aloud the verdict reflecting that the jury found the multiple victim allegation true. (§ 667.61, subd. (e)(4).) The trial court polled the jury regarding the multiple victim finding, and all 12 jurors confirmed that "true" was their finding.

    2.    *ANALYSIS*

    a.    <u>Contentions</u>

Defendant contends the trial court erred by not entering the jury's "not true" finding on the multiple victim allegation (§ 667.61, subd. (e)(4)). The People, as represented by the Attorney General's Office (the AG), concede defendant is correct. The People, as represented by the Riverside County District Attorney's Office (the DA), dispute the contention.[8]

---

[8] In this appeal, the AG is the attorney of record for the People and the DA is amicus curiae. The DA's application to file an amicus curiae brief was granted by this court on July 20, 2022.

25

## b. Law

### i. *Section 1161*

Section 1161 provides, in relevant part, "When there is *a verdict of conviction*, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict, and if, after the reconsideration, they return the same verdict, it must be entered; but when there is a *verdict of acquittal*, the Court cannot require the jury to reconsider it."  (Italics added.)

We present relevant cases in chronological order, in order to illustrate the evolution of case law addressing this issue.

### ii. *Keating*—1981

In *Keating*, when the jury "returned from its deliberations, the jury presented the court with signed and dated verdict forms of both guilty and not guilty as to each count and both true and not true as to each special allegation.  The court instructed the jury to retire for further consideration of the verdicts, commenting, 'the special finding with respect to any one particular count can either be true or not true and it cannot be both. The finding of guilty or not guilty as to any one count can only be guilty or not guilty. It cannot be both.'  The jury retired, returning five minutes later with verdict forms showing guilty verdicts on all charged counts."  (*People v. Keating* (1981) 118 Cal.App.3d 172, 181-182 (*Keating*).)

"[The defendant] characterize[d] the return of inconsistent verdict forms as the equivalent of a 'verdict of acquittal' precluding reconsideration."  (*Keating*, *supra*, 118 Cal.App.3d at p. 182.)  The appellate court concluded the trial court did not err,

26

explaining, "What the trial court directed the jury to reconsider was not a verdict of acquittal, but a clerical inconsistency between the verdict forms and the stated verdicts. The jury's short deliberation after discovering its error indicates that the jury had merely filled out the wrong form and quickly corrected the mistake." (*Keating*, *supra*, 118 Cal.App.3d at p. 182.)

### iii.    *Bigelow—1989*

In *Bigelow v. Superior Court* (1989) 208 Cal.App.3d 1127 (*Bigelow*), "[t]he jury had first submitted a verdict which acquitted Bigelow of murder, but found that the charged special circumstances existed." (*Id.* at p. 1129.) "The trial court refused to record the verdict. When the judge first read the verdict, he declared that it was not consistent. He asked the jury to retire to the deliberation room, and then said to counsel that the finding of not guilty of murder was inconsistent with the finding that the special circumstances were true." (*Id.* at p. 1130.) "The judge recalled the jury and told them that because of inconsistencies in the verdict form the court would have to ask the jury for additional deliberations or clarifications." (*Id.* at pp. 1130-1131.)

The appellate court concluded that the trial court had three options when confronted with the inconsistency between the verdict and findings:  (1) grant a motion to record the verdict of acquittal; (2) poll the jury to determine if all 12 jurors voted for acquittal; or (3) "inform[] the jury that the acquittal was not consistent with findings of special circumstances and ask[] it to clarify its verdict to show its true intent." (*Bigelow*, *supra*, 208 Cal.App.3d at p. 1136.)  The appellate court then repeated the last

27

two options, explaining that the defendant "had a right at that point to have the verdict tested, whether by polling or by explanation to the jury of the problem." (*Ibid.*)

Ultimately, the appellate court concluded the trial court erred by "sen[ding] the jury back to deliberate. Such deliberations continued for an entire day and one-half, . . . . During all that time the jury was not told why its verdict was not acceptable. This conduct by the trial court amounted to mandating reconsideration of a verdict of acquittal and is forbidden by statute and by precedent." (*Ibid.*) The appellate court distinguished its case from *Keating*, *supra*, 118 Cal.App.3d 172 because the inconsistency "in *Keating* was corrected within five minutes." (*Bigelow*, *supra*, 208 Cal.App.3d at p. 1138.)

iv. *Avila—2006*

In *People v. Avila* (2006) 38 Cal.4th 491, 599 (*Avila*), "[t]he jury found all three defendants guilty of two counts of first degree murder," including findings for all three defendants that the murders occurred during a rape. The jury found one of the defendants "guilty of rape while acting in concert [citations] but found [the] defendant and [the third perpetrator] not guilty of that offense." The trial court denied the defendant's motion for a mistrial but "struck the rape-murder special circumstance as to both murder counts." (*Id.* at pp. 599-600.)

"On appeal, [the] defendant identifie[d] two purported inconsistencies in the verdicts against him. He assert[ed] the jury found true the rape-murder special circumstance but found him not guilty of the crime of rape. He also assert[ed] that the true finding on the rape-murder special circumstance, which required the murder to

have been committed during the commission of rape (§ 190.2, subd. (a)(17)), was inconsistent with the true finding on the witness-killing special circumstance, which required the murder to have been committed after the commission of rape (§ 190.2, subd. (a)(10))." (*Avila*, *supra*, 38 Cal.4th at p. 600.)

The high court explained, "As a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] Although ' "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted." (*Avila*, *supra*, 38 Cal.4th at p. 600.)

v. *Guerra—2009*

In *People v. Guerra* (2009) 176 Cal.App.4th 933, 935 (*Guerra*), the jury found the defendant guilty of "sex crimes against his daughter and another minor. The jurors initially found untrue five enhancement allegations that multiple victims were involved." The trial court stated that there appeared to be an inconsistency in the verdicts and finding "because the allegations were found not true." (*Id.* at pp. 936-937.) The jury foreperson explained that the jury misunderstood the multiple victim finding

29

because they thought there had to be multiple victims in a single count. (*Id.* at p. 938.) The defendant's attorney argued that the verdicts and findings should be recorded because "[t]he verdict forms are signed and dated, and inconsistent jury verdicts are not uncommon." (*Ibid.*) The trial court reinstructed the jury on the law for the multiple victim allegation and asked the foreperson if the jury wanted "to go back into the jury room to discuss that?" (*Id.* at pp. 939-940.) The foreperson responded, "Yes, sir. We misunderstood." The trial court excused the jury to the "deliberation room to reconsider the findings on those allegations." (*Id.* at p. 940.) After a "brief recess," the jury returned a true finding on the multiple victim allegation. (*Ibid.*)

On appeal, the defendant asserted the trial court erred by inviting the jurors to reconsider their finding on the multiple victim allegation. (*Guerra*, *supra*, 176 Cal.App.4th at p. 941.) The appellate court quoted section 1161 and *Avila*. (*Guerra*, at pp. 941-943.) The appellate court explained that "the trial court impermissibly invited the jury to 'reconsider' its not true findings and allowed the jurors to deliberate anew. This was in excess of the court's authority; after the jury returned not true findings as to the five enhancement allegations, 'the trial court could not resubmit [those] matter[s] to the jury for further deliberation.' " (*Id.* at p. 944.) The appellate court reversed the true findings. (*Id.* at p. 945.)

### vi.    *Carbajal—2013*

In *People v. Carbajal* (2013) 56 Cal.4th 521, 525 (*Carbajal*), the "[d]efendant was charged with sexually molesting two victims. A jury convicted [the] defendant of some counts involving one victim while deadlocking on all counts involving the other

victim.  Nevertheless, the jury returned a true finding on a 'One Strike' allegation that [the] defendant had committed offenses against multiple victims.  (Pen. Code, § 667.61, subds. (b), (e)(4); . . . .)  Believing the jury's true finding was made in error, the trial court instructed the jury on the law and ordered further deliberations.  When the jury quickly returned, the trial court did not ask for or receive a verdict from the jury.  Believing the jury had again erred, this time by making a not true finding, the court gave a lengthy comment with additional instructions and again ordered further deliberations.  The jury then returned a third time with a blank verdict form and indicated it had deadlocked on the multiple victim allegation.  The trial court declared a mistrial, and [the] defendant was retried.  A second jury convicted [the] defendant of counts involving the other victim and found true the multiple victim allegation.  The issue presented [was] whether [the] defendant could be properly retried on the multiple victim allegation."

The Supreme Court wrote, "We recognize that there is case law permitting a trial court to clarify an 'ambiguous' verdict.  For example, appellate courts have held that if a jury returns a verdict finding the defendant guilty and not guilty on the same count, the trial court may request clarification.  (See *People v. Keating* (1981) 118 Cal.App.3d 172, 182 . . . ; *People v. Mestas* (1967) 253 Cal.App.2d 780, 787 . . . .)  Appellate courts have also held that a trial court may seek clarification where a jury finds the defendant guilty of a greater offense but not guilty of a lesser included offense.  [Citations.]  In these cases, asking the jury to clarify its verdict did not contravene the procedural requirements of the statutory scheme because it was not possible to understand whether

the jury had actually convicted or acquitted the defendant of the specified counts. Clarification was necessary to determine whether there was an intelligible verdict at all.

"But the trial court in this case did not attempt to clarify an unintelligible verdict. Whatever finding the jury might have returned following its second set of deliberations, there is no reason to think the trial court would have been unable to discern what the jury's finding was. A verdict of true or not true on the special allegation would have been inconsistent with the jury's findings on the substantive counts, but it would not have been unintelligible in the way that a finding of guilt and acquittal *on the same count* is.

"Mere inconsistency does not provide a valid reason for courts to reject a jury verdict. . . . [O]ur courts have consistently held that '[a]s a general rule, inherently inconsistent verdicts are allowed to stand.' (. . . *Avila*[, *supra*,] 38 Cal.4th [at p.] 600.)

"Thus, apart from the limited circumstance specified in section 1161—where 'it appears to the Court that the jury have mistaken the law' in initially rendering 'a verdict of conviction'—a trial court may not decline to accept a jury verdict, or refuse to hear the verdict, simply because it is inconsistent with another verdict rendered by the same jury in the same case. Importantly, this is not some odd quirk of our justice system. ' "Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review[.]" ' (*Guerra*, *supra*, 176 Cal.App.4th at p. 942[.]) A trial court's obligation to accept a jury verdict even if inconsistent with the jury's other

32

verdicts is a corollary of these principles. (*Id*. at p. 943[.]) 'To allow a judge to question a jury's process of deliberate decision, even though done in good faith to avoid an apparent miscarriage of justice, could result in abuses far outweighing the infrequent inability to correct what may appear to be . . . erroneous or a misunderstanding. And this must be true, even though reconsideration by the jury results in a verdict more accurately reflecting the jury's intentions.'

"In sum, except as provided in section 1161, a trial court may not reject a jury's verdict and send the jury back for further deliberations based on the court's belief that the jury made a mistake." (*Carbajal*, *supra*, 56 Cal.4th at pp. 532-533.)

### c. <u>Analysis</u>

Defendant contends that "section 1161 permits the court to make a very limited inquiry to determine whether *the guilty verdict* was based on an erroneous misunderstanding of the law. But it does not permit the court to ask whether the acquittal is in error." Defendant contends the trial court's clarifying inquiry should have ceased once the trial court confirmed that the jury intended to convict defendant on the two substantive counts. Defendant asserts, "At th[at] point, it was clear that if there were a misunderstanding of law, it had resulted in an acquittal. The court had no authority to further probe the jury's reasoning for entering the not true finding. . . . The court was required to enter the verdicts, in accord with the rule that inconsistent verdicts are permitted."

" ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.

33

[Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) " '[I]f the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 357.)

Section 1161 expressly authorizes the court, when there is a guilty verdict, to explain to the jury why it appears to the court that the jury made a mistake of law. The statute is silent as to what, if anything, the trial court may affirmatively say to the jury if the jury returns an acquittal and the trial court suspects there has been an error of law. However, there are other relevant statutes to fill that gap.

Section 1163 provides, "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation."

Section 1164, subdivision (a), provides, "When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case."

Under section 1161, the trial court could ask the jury about the guilty verdicts to the extent it appeared the jury arrived at those verdicts due to a mistake of law. Indeed,

the trial court began its questions of the jury foreperson by confirming the guilty verdicts. The trial court asked the foreperson, "So am I correct, then, that you found guilt on two or more victims?" The foreperson responded, "Just guilt on [Niece] and [Niece-2]." The trial court then confirmed, "So your finding was two victims; correct?" The foreperson replied, "Yes." Those questions complied with section 1161 because they pertained to the guilty verdicts.

In regard to the "not true" multiple victim finding, the trial court could have allowed that finding to be read, and then, if requested by one of the parties, polled the jury (§ 1163) or it could have "inquire[d] of them whether it is their [finding]" (§ 1164, subd. (a)). If the jury affirmed its "not true" multiple victim finding, then that finding should have been allowed to stand. (*Carbajal*, *supra*, 56 Cal.4th at p. 532.) If a juror had answered the poll or question in the negative, then the trial court could have directed the jury to resume its deliberations. (§§ 1163, 1164, subd. (a).)

In departing from the statutory procedures set forth in sections 1161, 1163, and 1164, after confirming the jury's guilty verdicts, the trial court said, "Then I think your finding form is in error that's been submitted." The trial court explained that the multiple victim finding applies when "[i]t's two or more." The jury foreperson replied, "Oh. It says 1 through 4, not 1 to—" The record can reasonably be read as the trial court telling the jury that the jury erred in its understanding of the multiple victim verdict form, and then informing the jury of the court's understanding of the form. Thus, by the time the trial court asked the jury foreperson, "So is there an error in the

finding?" the answer had been predetermined by the trial court effectively telling the jury that the jury made a mistake.

The appellate court in *Guerra* reached a similar conclusion: "Given the formality of the setting of a superior court, over which the trial judge presides in a commanding display of authority, and in light of the jurors' respectful and deferential tone toward the trial court as everyone discussed the inconsistent verdict, it is possible to interpret the court's invitation to reconsider the findings as something akin to an order from the jurors' perspective. . . . So it is no surprise tha[t] when the court asked, 'would you like to go back into the jury room to discuss that?' the jury foreperson, without, as far as this record discloses, asking any other juror for an opinion, immediately replied, 'Yes, sir. We misunderstood.' " (*Guerra*, *supra*, 176 Cal.App.4th at p. 944.)

Similarly, in the instant case, after the trial court announced that it suspected an error and explained the error, the foreperson asked the court, "All right. So would I refill this out?" The trial court responded by asking the foreperson if the jury had erred, but at that point, the court's question was effectively rhetorical given that the court had already explained its belief that the jury had erred. The foreperson, without asking any other juror, said "Yes. There is an error. Sorry about that."

The point of proceeding by polling the jury (§ 1163) or asking the jury to confirm its finding (§ 1164, subd. (a)) is "to reduce the likelihood of a trial court unduly, even if inadvertently, influencing the jury to reach a particular outcome." (*Carbajal*, *supra*, 56 Cal.4th at p. 531.) The trial court's ability to influence the jury

36

explains why the trial court can give its opinion that the jury made a mistake of law and explain its reasoning when directing the jury to reconsider a guilty verdict but cannot do the same in regard to an acquittal. (§ 1161.) It is critical that the trial court not influence the jury to enter a finding of guilty or "true." (*Carbajal*, at p. 531 ["the risk of coercion is enough to warrant strict adherence to clear and detailed procedures for receiving a jury verdict"].)

In the instant case, the trial court expressed its opinion that the jury made a mistake and explained its reasons for that opinion. That procedure would have been acceptable if the trial court had then directed the jury to reconsider its guilty verdicts. (§ 1161.) However, the trial court did not direct the jury to reconsider its guilty verdicts, instead, it returned the jury to the deliberation room so the "not true" finding could possibly be changed. Such a procedure is not permitted. The statutory procedures for taking a verdict "warrant strict adherence." (*Carbajal*, *supra*, 56 Cal.4th at p. 531.) So, if the trial court wanted to inquire into the inconsistent multiple victim finding, it could have read the finding and then, if requested, polled the jury (§ 1163) or "inquire[d] of them whether it is their verdict" (§ 1164, subd. (a)). By not reading the finding aloud, then informing the jury of its opinion that the jury erred, then explaining its reasons for that opinion, and then returning the jury to the deliberation room to address the "not true" finding, the trial court erred.

The DA contends the trial court did not err because "the court is not required to stand silent when the verdict is ambiguous and jurors express confusion regarding verdict forms. For example, in *Keating*, *supra*, 118 Cal.App.3d 172, the jurors returned

both guilty and not guilty verdict forms and true and not true findings. The court sent the jurors back with further instruction."

There is a difference between ambiguous verdicts and inconsistent verdicts. In *Keating* the verdicts were ambiguous because the jury completed guilty and not guilty verdict forms for all the charges. As a result, it was unclear for each individual charge whether the jury found the defendant guilty or not guilty. (*Keating*, *supra*, 118 Cal.App.3d at p. 181-182.) In the instant case, the jury's verdicts were inconsistent with the multiple victim finding, but the decisions as to the individual counts and the allegation were clear. (*Carbajal*, *supra*, 56 Cal.4th at p. 532 ["A verdict of true or not true on the special allegation would have been inconsistent with the jury's findings on the substantive counts, but it would not have been unintelligible in the way that a finding of guilt and acquittal on the same count is"].)

Accordingly, the trial court could have remained silent regarding the "not true" finding on the multiple victim allegation because " '[a]s a general rule, inherently inconsistent verdicts are allowed to stand.' " (*Carbajal*, *supra*, 56 Cal.4th at p. 532.) However, if the trial court wanted to address the inconsistency, then it needed to do so in compliance with sections 1161, 1163, and 1164. (*Carbajal*, at pp. 530-531.) By expressing its belief that the jury erred and explaining its reasons to the jury prior to asking the jury foreperson, "So is there an error in the finding?," the trial court erred. (*Id.* at p. 531 ["The procedural requirements set forth in the statutory scheme apply regardless of whether a reviewing court can discern that there was no actual coercion of the jury by the trial court"].)

Next, the DA contends "[t]he trial court did not violate section 1161 because the inconsistent [verdicts and finding] were not based on a mistake of law." If the DA were correct that section 1161 only applies when there is a mistake of law, then the trial court still erred. The trial court had two options for addressing the jury's inconsistent verdicts and finding. The trial court could have read the finding and then, if asked by a party, either polled the jury (§ 1163) or "inquire[d] of them whether it is their verdict" (§ 1164). "[S]trict adherence" to these procedures is required. (*Carbajal*, *supra*, 56 Cal.4th at p. 531.) The alleged inapplicability of section 1161 would not have given the trial court free reign on discussions with the jury prior to taking the verdicts. In sum, the trial court erred.

### d.      Prejudice

We examine whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Anzalone* (2013) 56 Cal.4th 545, 552-560.)

The pertinent portion of the trial court's and foreperson's conversation is as follows:

"The Court:  Why don't you stop right there.  [¶]  So am I correct, then, that you found guilt on two or more victims?

"[Jury Foreperson]:  Just guilt on [Niece] and [Niece-2].

"The Court:  Yeah.  That's two.

"[Jury Foreperson]:  Yeah, two.

39

"The Court: All right. Special allegation, does it not read two or more? [¶] Let's see the special allegation. [¶] So your finding was two victims; correct?

"[Jury Foreperson]: Yes.

"The Court: Then I think your finding form is in error that's been submitted.

"[Jury Foreperson]: For the 1 through 4 charges—that paper?

"The Court: Let me have the bailiff submit this back to you. You tell me if this is in fact your verdict.

"[Jury Foreperson]: Oh. It says 1 through 4, not 1 to—"

The conversation reveals that the jury misunderstood the multiple victim verdict form. The trial court walked the foreperson through the fact that the jury found two victims, and at that point, the foreperson did not realize the error in the multiple victim finding. It was not until the courtroom deputy returned the verdict form to the foreperson and the trial court said it thought there was an error that the foreperson realized, "Oh. It says 1 through 4, not 1 to—"

If, upon noticing the inconsistent verdicts and finding, the trial court had polled the jury for confirmation of the verdicts and finding (§ 1163), then, based on the foregoing conversation, the jury would have confirmed the inconsistent verdicts and finding were because the jury misunderstood some aspect of the multiple victim verdict form. Thus, if the trial court had followed the correct procedure, it is reasonably probable that the inconsistent "not true" finding on the multiple victim allegation would have been recorded. Accordingly, the trial court's error was prejudicial. We will

40

reverse the true finding on the multiple victim allegation and direct the trial court to resentence defendant.

## I.    BOOKING FEE

Defendant contends that the $428.21 booking fee (former Gov. Code, § 29550.1) must be vacated because booking fees are no longer permitted (Gov. Code, § 6111, subd. (a)).  The AG concedes that defendant is correct.  We have concluded *ante* that defendant must be resentenced.  Therefore, we will reverse the entirety of defendant's sentence, " 'so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  Accordingly, this issue is moot.  (*People v. Rish* (2008) 163 Cal.App.4th 1370, 1380 [an issue is moot when a decision can have no practical effect].)

## DISPOSITION

The true finding on the multiple victim allegation (§ 667.61, subd. (e)(4)) is reversed.  Defendant's entire sentence is reversed.  The trial court is directed to resentence defendant.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER                                    
Acting P. J.

We concur:

SLOUGH                                    
J.

RAPHAEL                                   
J.

41